Carroll
No. 88-119

REAL ESTATE ADVISORS, INC. d/b/a THE CHENEY COMPANIES

v.

WHITTIER LIFTS, INC. & WHITTIER LIFTS TRUST

WHITTIER LIFTS, INC. & WHITTIER LIFTS TRUST

v.

WALTER CHENEY

January 31, 1990

*Devine, Millimet, Stahl & Branch P.A.*, of Manchester, and *Merrill & Broderick*, of Manchester (*Mark W. Dean* on the brief and orally), for Real Estate Advisors.

*Sheehan, Phinney, Bass & Green P.A.*, of Manchester (*James Q. Shirley* and *Marc W. McDonald* on the brief, and *Mr. Shirley* orally), for Whittier Lifts.

SOUTER, J. The Superior Court (*Charles T. Gallagher*, Esq., Master; *Dickson*, J.) dismissed the buyer's petition for specific enforcement of a land sale contract, citing the buyer's own breach; in the seller's action on the contract, only nominal damages were awarded. Thereafter, the Court (*O'Neil*, J.), on the recommendation of the same master, dismissed the seller's claim under the buyer's bond for costs and damages that might result from an order barring sale of the property to a third party *pendente lite*. The buyer appeals the dismissal of its petition and the seller's verdict; the seller appeals the denial of damages under the bond. We affirm as to every matter.

The defendants in the equity proceeding (and plaintiffs in the action at law), Whittier Lifts, Inc. and Whittier Lifts Trust (Whittier), together own 650 acres of land with fixtures and related equipment known as "Mt. Whittier Ski & Recre-action Area" in West Ossipee. After enduring some years with revenues inadequate to cover the costs of debt and property maintenance, Whittier tried to negotiate a sale of the property and later contracted with Messrs. Sanders & Mock to sell it at public auction. At the auctioneers' suggestion, the land was divided into parcels and offered for bidding both as separate and combined lots, with the final sales to be in whatever combinations would produce the highest total of bids, but subject to approval by the local planning board as a subdivision if the boundaries of the tracts as thus determined differed from pre-existing lot lines.

In advertising the sale, Sanders & Mock produced an illustrated brochure, with the following "note" within its text:

> "All lot descriptions, acreages and dimensions are approximations used for advertising purposes only and no warranty of accuracy is expressed or implied. Prospective bidders should examine the property, zoning regulations, deeds and other legal matters prior to the auction and be confident they are buying with full knowledge of the facts.

LOTS 1 & 4–8 will be sold subject to final planning board approval. Deeds will be conveyed in the largest configuration of parcels actually sold, with final survey completed at seller's expense."

The recipients of this document included the plaintiff in the equity proceeding (and defendant in the action at law), Real Estate Advisors, Inc. d/b/a The Cheney Company (Cheney).

Cheney's two principals, Walter Cheney and June Barry, attended the auction on August 8, 1986, which was conducted by Wayne Mock and Emory Sanders. Mock opened the proceedings by reading a list of terms and conditions of sale that substantially tracked the language of the brochure and included the foregoing quotation. There was evidence at trial that he supplemented the items on the list by announcing that the sellers would provide no survey if the boundaries of the property as finally sold followed existing lot lines of record. There was also testimony that before or during the bidding someone in the audience enquired whether the land was assessed for purposes of local property taxation in accordance with its current use, under RSA chapter 79-A (Supp. 1988). It is said that Mock replied that the land was so assessed, and that Sanders stated that it would be sold subject to the legal consequences of that assessment scheme. The master found that Mock so stated.

At the close of the bidding, Cheney's bids for lots 1 and 4–8 combined topped all others, and Cheney's principals prepared to sign a purchase and sale agreement proffered and executed by Mock. Its text covered only one printed page and twice referred to terms and conditions of sale extrinsic to the document, although it did expressly repeat one condition, that the agreement was subject to Whittier's approval. The record of testimony indicates that, prior to execution of the contract on Cheney's behalf, Mock told Walter Cheney that the conveyance would follow existing lot lines, obviating the need for a survey. Barry signed the agreement for Cheney, together with an addendum that expressed Cheney's intention to discontinue excavations from a gravel pit on the premises, the surface of which Whittier bound itself to reclaim at its own expense within a reasonable time.

After examining the title, Walter Cheney alleged that a series of defects existed, relating to mineral rights, boundary descriptions, undischarged mortgages and unpaid taxes. He was even more vociferous in claiming that the potential land use change tax was a lien or encumbrance that Whittier was obliged by the contract to remove. *See* RSA 79-A:7 (Supp. 1988) (when use of land receiving

favorable current use tax treatment is changed to non-qualifying purpose, further tax is payable). Whittier responded, first, that the possible tax assessment contingent upon Cheney's subsequently changing the use of the land merely reflected a "restriction," subject to which Cheney had purchased under the terms of the contract; and, second, that, even if the potential for tax be treated as a lien, the lien had been disclosed and its discharge made the buyer's responsibility under the term of the agreement exempting liens and encumbrances "otherwise stated" from the warranty of clear title.

The disputes persisted through the date set for closing. Since Whittier had counted on the proceeds of the Cheney sale to discharge liens affecting portions of the property sold to other buyers, it had to borrow funds for this purpose before conveying those other parcels. Meanwhile, continuing negotiations boiled Cheney's claims and objections down to three matters: the potential use change tax, Whittier's refusal to provide a survey, and Whittier's refusal to provide security for its obligation to reclaim the surface of the gravel pit. As consideration for withdrawing its objections, Cheney demanded a $15,000 reduction in purchase price and a $35,000 escrow to pay for survey costs, demands which blocked a second scheduled closing.

In November, 1986, Cheney filed the instant petition for specific performance, and the following month the superior court awarded temporary relief by an order (not transferred to us) either enjoining Whittier from selling to any third party, or permitting Cheney to record a notice of *lis pendens*. In February, 1987, Whittier brought a cross-action at law for damages. Thereafter, in the equity proceeding, Cheney was ordered to provide an injunction bond of $100,000 as of July 9, 1987, in lieu of which the parties agreed on Cheney's escrow of a certificate of deposit in that amount.

Trial of Cheney's equity suit resulted in findings that Cheney, not Whittier, was in breach, and the petition was dismissed. Trial of Whittier's action brought a plaintiff's verdict, but only in the nominal amount of $1, since the market value of the property had risen during the period of dispute. See *Zareas v. Smith*, 119 N.H. 534, 537, 404 A.2d 599, 600–01 (1979). Although judgment on this verdict was ordered without prejudice to Whittier's claim for consequential damages under the terms of the injunction bond furnished by Cheney in the first proceeding, Whittier's subsequent motion for such an award was denied on the ground that any such damages had resulted from the litigation, not the injunction. Since Whittier took no appeal from its nominal verdict in the damage

action, the cross-appeals before us are those brought by Cheney, from the denial of specific performance and the verdict for nominal damages, and by Whittier from the denial of damages under the bond.

Cheney's appellate burden is a heavy one. Cheney was denied specific performance under the rule that equity withholds relief from petitioners with soiled hands, see *Pierce v. Morse*, 65 N.H. 196, 198, 18 A. 792, 793 (1889), the reasons for disqualification in this case being the three findings of Cheney's own breach of the very contract it sought to enforce. *See id.* Unless, then, Cheney can demonstrate trial court mistake in each of the three findings of breach, the dismissal must stand, and so must the nominal verdict in the action at law. We uphold the trial court on all three.

Cheney argues that its demand for a survey was no breach because the auction brochure setting the terms of the sale promised the buyer a survey, and the promise was not modified before the fall of the auctioneer's hammer, when the contract is said to have been complete. Cheney ignores the fact, however, that the terms of the sale also called for Whittier's approval and the execution of a written purchase and sale agreement, and thus provided the master with a clear evidentiary basis to conclude that the parties understood and intended the agreement to be final only upon execution of a written document approved by Whittier. *See Smith v. Liberty Mut. Ins. Co.*, 130 N.H. 117, 124, 536 A.2d 164, 168 (1987) (mutual intent of parties, objectively manifested, governs content of agreement). Because there was adequate evidence that prior to execution of the written contract Mock led Walter Cheney to understand that the undertaking to provide a survey would not apply to Cheney's purchase of the previously recognized lots, the execution of the agreement on Cheney's behalf was properly treated as manifesting an understanding that Cheney would get no survey.

Cheney next charges the trial court with error when it found Cheney in breach by insisting on reducing the purchase price to offset the contingent liability for a use change tax. Cheney rests on the term of the agreement calling for conveyance free of all liens and encumbrances "except as may otherwise be stated," arguing that neither Mock nor anyone else ever stated orally or in writing that the property was subject to current use assessment and was offered subject to the legal consequences of that status.

This argument's fatal hurdle, however, is simply the master's finding that one of the auctioneers told the bidders that portions of the property "were subject to current use assessment." This finding was evidently based on Mock's testimony that he himself

so told a bidder, and that he and his partner probably made their statements on the subject after the start of the bidding, though he admitted that the exchange could have occurred between the advertised starting time of 10:00 o'clock and the commencement of actual bidding at about 10:45. The timing of the remarks is of no consequence, since Mock also testified without contradiction that Cheney and Barry were registered as bidders and in the audience before 10:00 o'clock, and neither Cheney nor Barry denied that or testified that either of them left the audience between their arrival and the start of formal bidding. Thus, the evidentiary basis for treating the consequences of the current use assessment as a disclosed encumbrance, within the meaning of the written contract.

Cheney tries to counter the master's finding by maintaining that its principals never heard the announcement, that other witnesses testified they did not hear it, and that a tape recording of the sale did not pick up the statement. To the extent, however, that Cheney is simply trying to controvert the master's findings that Mock and his partner made the statements, our review on appeal is confined to the existence or not of a reasonable evidentiary basis for the trial court's conclusion. See *Chagnon Lumber Co., Inc. v. DeMulder*, 121 N.H. 173, 175, 427 A.2d 48, 50 (1981). Here, we can only say that nothing in the evidence barred the master from finding Mock more reliable or credible than the other witnesses, and that the admittedly incomplete videotape is incompetent to demonstrate that the statements were not made.

To the extent, on the other hand, that Cheney is questioning whether any statement made was reasonably calculated to be heard by the audience and thereby to function as an objective manifestation of intent imputable to a bidder in that audience, see *Smith v. Liberty Mut. Ins. Co.*, 130 N.H. at 124, 536 A.2d at 168, it is enough to say that the master was entitled to take Mock's testimony as an indication that the auctioneers' responses to a question from the audience were spoken in a fashion appropriate under the circumstances, so as to be heard generally. In the hindsight of this appeal, it is, of course, natural for us to wish that any issue of the auctioneers' volume had been addressed specifically by Whittier or expressly raised by Cheney. But neither party did probe the matter through the witnesses, and neither asked the master for any express finding on the point; and on this state of the record there is significance in the fact that none of the witnesses testified to any difficulty in hearing the auctioneers' statements generally. In sum, the fact and audibility of the announcement about current use

presented issues of evidentiary evaluation, and nothing in the record compels us to find the master's conclusions unreasonable.

Cheney's challenge to the third finding of breach calls for only the briefest mention. Cheney has never claimed that the agreement required security for Whittier's obligation to reclaim the surface of the gravel pit, but has predicated its demand, rather, entirely on the insecurity supposedly created by Whittier's alleged breaches of contract in refusing to provide a survey and to make some provision for the contingent liability under the current use statute. Since neither refusal was a breach, Cheney had no cause to demand security for reclamation even on its own reasoning.

■ There being no error in finding Cheney's serial breaches of the very contract it ostensibly sought to enforce, we turn to Whittier's cross-appeal. It will be recalled that Whittier took no appeal from the limitation to purely nominal damages in its own action at law against Cheney, so that the only issue now before us is the court's refusal to award damages under the injunction bond posted by Cheney in the equity suit.

The threshold problem is to ascertain the terms of the bond, on which Whittier stakes its claim. Unfortunately, the terms were never expressed from the bench, embodied in an order, or written out by the parties, and Whittier, as the proponent, consequently has a burden to demonstrate the scope of the protection it claims to have. Although it would be unreasonable to suppose that the intended terms would have authorized the recovery of damages under the bond without demonstrating that the injunction, or its equivalent, was wrongfully issued, see SUPER. CT. RS. 161(c) and 163, the intended scope of liability in that instance is not so readily inferable. On the one hand, we may look to *Rogers v. Clough*, 76 N.H. 272, 274, 81 A. 1075, 1076 (1911) for an example of an expansive bond, conditioned to secure payment of damages, expenses and costs, including those occasioned in litigating the underlying suit or action, in the event the injunction should be found wrongful. On the other hand, *Smith v. Smith*, 83 N.H. 342, 344, 142 A. 685, 685 (1928) illustrates a narrower bond conditioned solely on payment of items incurred by reason of a wrongful injunction and securing only those costs, damages and expenses that would not have been incurred in the absence of (*i.e.*, but for) the injunction itself. As between these alternatives it is difficult to see how the silent record would enable Whittier to demonstrate any right to indemnification beyond the scope of the narrower bond exemplified in *Smith*. *Smith*, in any case, seems to have been the model for what the parties understood the bond to provide, and

Whittier's brief describes its claim accordingly, as one for "such damages as [the finder of fact] determines directly and naturally resulted from the [wrongful] issuance of the injunction ... [,] limited by the requirement that only such damages as are caused by the injunction are recoverable."

Now, it is clear that Whittier was wrongfully enjoined, given our previous conclusion that the trial court was entitled to reach its finding that Cheney broke the agreement, *see Allen v. Newmarket Associates*, 96 N.H. 340, 342, 76 A.2d 920, 922 (1950). But Whittier was nevertheless denied indemnification under the bond for counsel fees, costs, and carrying costs during the pendency of the injunction, because the master found that "the injunction by itself was not the cause of [Whittier's] inability to realize upon the property. The real cause was plaintiff's claim for specific performance and the fact that this petition was pending."

Although Whittier attacks this conclusion, the attack is really an argument about evidentiary weight, which it was the master's business to resolve. In support of its position before the master that damages must have flowed from the injunction alone, Whittier tried to establish the marketability of the property, but for the injunction, by offering the opinion of an expert witness that in November of 1986 it could readily have been resold to another buyer at the contract price of $471,000. There were, however, reasons to question the soundness of this opinion.

Cross-examination of the expert witness took its toll: he conceded that he had been in the real estate business only two years at the time of his testimony, and only one month at the time of the sale to Cheney. Mt. Whittier was the only ski area he had ever listed, and he claimed no qualification as an appraiser. The force of his opinion was weakened further when Whittier's principal conceded that he had known of only one other potential buyer with any interest in the property during the relevant period, and admitted that this person would not have considered purchasing as long as Cheney pressed any claim against the property.

The master was accordingly entitled to reject the expert's opinion and to conclude that the suit, not the injunction, had burdened Whittier with the continuing expenses it claimed as damages. If, indeed, the master had felt any misgivings about this inference, he could have resolved them by recalling some further testimony of Whittier's principal, that the expenses submitted to prove damages compensable under the bond were identical to those submitted to prove damages at the prior trial of the underlying suit.

■ Neither is there any apparent error, insofar as Whittier challenges the legal premises of the master's recommendation. Although Whittier cites *Monolith Portland Midwest Co. v. Reconstruction Finance Corp.*, 128 F. Supp. 824, 879 (S.D. Cal. 1955), and like cases, for the general proposition that costs and expenses of maintaining property that a litigant is wrongfully enjoined from selling are recoverable under a related injunction bond, Whittier's burden to prove but-for causation in this case requires it to demonstrate that the items of expense would not have been incurred in defending the underlying suit, and are solely attributable to the incremental effect of the ancillary injunction. *See Smith v. Smith*, 83 N.H. at 344, 142 A. at 685. The master, however, came out quite.to the contrary and concluded in effect that the underlying suit for specific enforcement of the contract rendered the subject property unmarketable, and caused the expenses in question, without regard to any injunction or formal recording of a *lis pendens* notice. Because this conclusion is not without support.in the evidentiary record, and is not off the point as a matter of law, *see New England Fiber Co. v. Bath Fiber Co.*, 115 N.H. 572, 575, 347 A.2d 169, 171 (1975), there is no apparent error.

*Affirmed.*

All concurred.